## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **T.G. et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 13-CV-0033-CVE-PJC** |
| | ) | |
| **REMINGTON ARMS COMPANY, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Now before the Court are Remington's Motion to Exclude the Testimony and Causation Opinion of Plaintiffs' Liability Expert, Motion for Summary Judgment, and Opening Brief in Support (Dkt. ## 37, 42, 48) and Plaintiffs' Motion for Partial Summary Judgment (Dkt. ## 40, 46). Defendant Remington Arms Company, Inc. (Remington) asks the Court to exclude the causation opinion of plaintiffs' expert witness, Charles W. Powell, P.E., and, if the expert testimony is excluded, to grant summary judgment in favor of Remington. Plaintiffs request that the Court apply offensive collateral estoppel and preclude Remington from relitigating whether the subject rifle was defective.

## I.

On December 1, 2010, S.H. took his father's Remington Model 700 rifle to hunt deer near his home in Fairland, Oklahoma, and three of his friends, T.G., K.G., and C.M., accompanied him. Dkt. # 37-3, at 14. When they were returning home, they were required to pass through two barbed-wire fences. It is unclear who was carrying the rifle at various points during the return trip due to conflicting statements from S.H. and C.M., but there is no dispute that T.G. and K.G. were not handling the rifle. Dkt. # 37-3, at 18-19; Dkt. # 37-4, at 2. C.M. and S.H. also disagree about who

was responsible for unloading the rifle before they crossed the barbed wire fences, and each believed that the other had unloaded the rifle. Dkt. # 37-3, at 18; Dkt. # 37-4, at 3. Regardless of who was responsible to unload the rifle, there was a cartridge in the chamber of the rifle as the boys were headed home. They crossed the first barbed-wire fence without incident. Dkt. # 37-3, at 17. When they reached the second fence, S.H. claims that he went through the fence first and C.M. handed the rifle over the barbed-wire. Id. at 19. C.M. recalls that he went through the fence first and that S.H. was attempting to pass the rifle over the barbed-wire. Dkt. # 37-4, at 3. Whether S.H. or C.M. was passing the rifle over the fence, the rifle discharged the cartridge in the chamber, and the cartridge went through T.G.'s left hand and struck K.G. in the abdomen. Id. at 27. S.H. and C.M. denied that they pulled the trigger when the shot was fired and they claim that the rifle discharged without a trigger pull.

On March 25, 2011, plaintiffs T.G. and K.G. filed this case in Ottawa County District Court alleging claims of manufacturer's products liability and negligence against Remington. Dkt. # 2-1, at 2-9. The case was removed to this court on the basis of diversity jurisdiction. Plaintiffs allege that the Model 700 rifle contains an inherent defect from the use of the "Walker" fire control system, and they retained Powell to offer an expert opinion as to the existence of a product defect and causation of plaintiffs' injuries. Powell examined the rifle and found that it was in "Good - NRA Modern Rifle Condition" Dkt. # 37, at 32. Powell described the events leading up to the discharge of the rifle as follows:

> On December 1, 2010, Mr. Htchison's [sic] gave permission to his son, [S.H.], to use the subject rifle to hunt deer near his home in Fairland. Accompanying [S.H.] on his deer hunt was his friend [C.M.] The subject rifle's magazine was loaded by [S.H.] and a cartridge chambered during the hunt, but no cartridge was fired. Near the end of the hunt, the rifle's cartridges were reportedly removed from its magazine but a cartridge remained in the rifle's chamber. Toward the end of the day the two hunters

were joined by friends, [K.G.] and [T.G.], who accompanied the hunters as they walked back to Mr. Hutchison's home.  The walk included the crossing of two barbed wire fences.  At the crossing of the second fence, the subject rifle was transferred across the fence's top wire strand by [S.H.] and [C.M.] During this transfer the rifle fired its chambered cartridge.  The bullet struck both [K.G.] and [T.G.] who were standing nearby, causing them each severe injury.  Both [S.H.] and [C.M.] testified that when the rifle fired neither person's finger was on the trigger of the rifle.

Id. at 32-33.  Powell conducted a visual inspection and a function test of the rifle, and he also conducted "trigger pull testing, safety lever testing, and microscopic examination of the subject rifle." Id. at 33.  Powell explained that the "Walker" fire system is used in Model 700 rifle, and this design uses a "Trigger Connector" around the front of the trigger.  Id. at 34-35.  Powell states that the connector is a design defect that allows that the rifle to fire without a trigger pull, because the connector is subject to interference with other components inside the fire control housing and this allows the rifle to release the firing pin without any user interaction with the trigger.  Id. at 35-36.  Powell disassembled the rifle and found that "particles, fibers, pieces of grass, and dried lubricant deposits were noted on the outside and inside of the fire control mechanism." Id. at 36.  He stated that such deposits have historically caused a Remington Model 700 rifle to fire without a trigger pull, but he does not state whether it could have caused the subject rifle to fire without a trigger pull.  Id.  However, he could not examine the fire control components because they were enclosed in a riveted housing that could not be removed, and he could not examine the key components of the Walker fire control system.  Id. at 37.  Powell found that, if the trigger was partially pulled and released without firing, the Sear-Connector Engagement Length was significantly reduced and the rifle could more easily fire due to external forces without a trigger pull.  Id. at 36.  Powell's report does not cite any evidence that the trigger was partially pulled before the shooting occurred.  Id. Powell states that the rifle has a safety that  prevents the rifle from firing when it is in "Safe"

3

position, but the evidence shows that the safety was set to "Fire" position when the plaintiffs were shot. Id. at 36-37. He also states that he has reviewed internal documents provided by Remington and he has reached the opinion that "[Remington is clearly aware that the insufficient engagement of the Walker fire control connector is the root cause in almost all inadvertent firings of Remington rifles that discharge without trigger pull." Id. at 37. Powell concluded that Remington was aware of a product defect and took no steps to use an available alternative design for a firing system that did not use a connecter, and the Model 700 rifle is not safe for use by the ordinary consumer. Id. at 39. It is not clear from Powell's report if he considered whether it was possible that the trigger was actually pulled when the shot was fired.

Remington retained its own firearms expert, Derek Watkins, to examine the rifle and determine what caused it to fire. Watkins initially noted that the rifle was in "abused" condition and the fire control system had not been properly cleaned. Dkt. # 49-8, at 10. Watkins performed a fire control function test and the rifle passed the test each of the five times it was tested. Id. at 13. He also noted that Powell had performed similar testing and the rifle passed the function tests performed by Powell. Id. Watkins conducted additional "trick" testing, and the rifle passed that testing as well. Id. at 14. Using a high-power three dimensional x-ray, Watkins examined the space between the connector and the trigger, and he found no contamination or debris that would interfere with the proper functioning of the rifle. Id. at 20-21. Watkins concluded that proper gun handling procedures would have prevented the accident and, due to the results of his testing, the trigger of the rifle must have been pulled to cause the rifle to fire. Id. at 23.

## II.

Defendant argues that Powell's causation opinion is unreliable, because he opines only that the use of a connecter in the Walker fire system is inherently unreliable and he failed to consider the specific facts giving rise to plaintiffs' injuries. Defendant also argues that Powell failed to rule out other possible causes before he reached his opinion that the connector caused the rifle to fire without a trigger pull. Defendant asks the Court to exclude Powell's causation opinion and enter summary judgment in favor of defendant due to a lack of evidence that a defect in the rifle caused plaintiff's injuries. Plaintiff responds that the use of a connector in the design of the Walker fire control system is an inherent defect and, due to conflicting deposition testimony and witness statements, Powell was not required to conclusively rule out all other possible causes of the accident before reaching a causation opinion.

Defendant has challenged the admissibility of Powell's testimony on the issue of causation, and the Court must preliminarily determine if his testimony on this issue should be admitted at trial. In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the Supreme Court held that district courts must initially assess the admissibility of "scientific" expert testimony under Fed. R. Evid. 702. The Supreme Court extended the gatekeeper role of federal district courts to all expert testimony in Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999). In Bitler v. A.O. Smith Corp., 400 F.3d 1227 (10th Cir. 2005), the Tenth Circuit discussed the role of district courts when considering a Daubert challenge to the admissibility of expert testimony. First, the court should make a preliminary finding that the expert is qualified to testify. Id. at 1232-33. Next, the proponent of expert testimony must establish that the expert used reliable methods to reach his/her

conclusion and that the expert's opinion is based on a reliable factual basis.  Id. at 1233.  The Tenth

Circuit cited four factors that district courts should apply to make a reliability determination:

> (1) whether a theory has been or can be tested or falsified; (2) whether the theory or
> technique has been subject to peer review and publication; (3) whether there are known or
> potential rates of error with regard to specific techniques; and (4) whether the theory or
> approach has "general acceptance."

Id. at 1233 (citing Daubert, 509 U.S. at 593-94).  The Tenth Circuit was clear that "a trial court's

focus generally should not be upon the precise conclusions reached by the expert, but on the

methodology employed in reaching those conclusions."  Id.  In other cases, the Tenth Circuit has

emphasized that any analytical gap in an expert's methodology can be a sufficient basis to exclude

expert testimony under Daubert.  Trucks Ins. Exchange v. MagneTek, Inc., 360 F.3d 1206, 1212-13

(10th Cir. 2004); Goebel v. Denver & Rio Grande Western R. Co., 346 F.3d 987, 992 (10th Cir.

2003).  Under Daubert, "'any step that renders the analysis unreliable . . . renders the expert's

testimony inadmissible.  This is true whether the step completely changes a reliable methodology

or merely misapplies that methodology.'"  Mitchell v. Gencorp Inc., 165 F.3d 778, 783 (10th Cir.

1999) (citing In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 745 (3d Cir. 1994)).

Defendant argues that Powell failed to rule out possible causes of the shooting other than the

alleged defect in the Walker fire system, because there is no indication in Powell's report or

deposition testimony that he considered evidence that conflicted with his causation opinion.  The

Court has reviewed Powell's report and it is unclear what evidence he considered to determine the

facts giving rise to the incident.  Powell seems to rule out the possibility of a trigger pull based on

S.H.'s and C.M.'s deposition testimony.  Dkt. # 37, at 32-33.  However, defendant has shown that

S.H. and C.M. have made conflicting statements about the events giving rise to the shooting.  S.H.

testified in his deposition that C.M. was handling the rifle before the shooting and he believed that

C.M. had removed all ammunition from the rifle.  Dkt. # 37-3, at 18.  In contrast, C.M. stated that S.H. claimed to have unloaded the rifle and that S.H. was handling the rifle before it was passed over the barbed-wire fence.  Id. at 37.  C.M. claims that his hands were not on the rifle at the time of the shooting and that S.H. maintained control of the rifle.  Dkt. # 37-4, at 14.  S.H. stated in his deposition that C.M. had control of the rifle at the time of the shooting and that S.H.'s hands were not on the rifle.  Dkt. # 37-3, at 20.  K.G. cannot clearly recall who was holding the rifle at the time of the shooting and he claims that he was not looking the rifle when it fired.  Dkt. # 37-5, at 2-3.  T.G. claims that C.M. had the rifle when it fired, but he was looking away at the moment of the shooting and cannot recall what C.M. was doing with the rifle.  Dkt. # 37-4, at 15.  A witness, David Reynolds, told police that S.H. approached him shortly after the shooting and said the rifle discharged after it was dropped on the ground.  Dkt. # 37-5, at 21.  S.H. told police that the gun had become entagled in the barbed-wire fence "and pulled the safety off hard and it went off."  Id. at 22.  During his deposition, S.H. denied that the rifle came into contact with the fence at the time of the shooting.  Dkt. # 37-3, at 18.  One law enforcement report lists the cause of the accident as "Trigger caught on object."  Dkt. # 37-5, at 27.  Powell's report does not note that there is conflicting testimony as to what caused the rifle to fire, and he appears to credit without question both S.H.'s and C.M's deposition testimony that they did not pull the trigger.  Dkt. # 37, at 32-33.

Due to the conflicting deposition testimony and evidence, the Court finds that Powell's failure to fully explain how he determined what happened before the shooting is not fatal to the admissibility of his testimony.  Powell is a firearms expert who was retained by plaintiffs to offer an expert opinion on the existence of a defect in the Model 700 rifle and the causation of plaintiffs' injuries.  Even if Powell had an opinion about the credibility of the witnesses, such testimony would

be inadmissible at trial and it will be up to the jury to determine what witness testimony to believe or discredit. Powell's deposition testimony does raise concerns that he failed to fully consider the deposition testimony and witness statements before reaching his opinions, and of particular concern is his decision to rule out the possibility of a trigger pull based only on S.H.'s and C.M.'s deposition testimony, but this is not a basis to exclude his testimony in a case such as this when the evidence does not give a clear picture of the event that caused plaintiffs' injuries.[1]

Defendant argues that there are at least four plausible scenarios, other than the alleged connector defect, that could have caused the rifle to fire, and Powell has failed to rule out those other scenarios as the cause of the shooting:

1. The rifle fired because the safety was in the "FIRE" position and the trigger was pulled, i.e., precisely the way this or any other firearm is designed and intended to operate . . .;

2. The rifle fired, without a pulling of the trigger, as the safety was moved from the "SAFE" position to the "FIRE" position because of unknown debris lodged on the tip of the trigger engagement screw . . .;

3. The rifle fired, without a pulling of the trigger, as the safety was moved from the "SAFE" position to the "FIRE" position because of unknown debris between the trigger body and the side plates thereby interfering with the free rotation of the trigger back under the sear . . .;

4. The rifle fired, without a pulling of the trigger, as the safety was moved from the "SAFE" position to the "FIRE" position because of unknown debris or corrosion between the trigger pin and the trigger pivot hole thereby interfering with the free rotation of the trigger back under the sear . . . .;

---

[1] In their response to defendant's <u>Daubert</u> motion, plaintiffs suggest that defendant should be precluded from arguing that the rifle fired after a trigger pull because there is no evidence to support this theory. Dkt. # 50, at 23. Plaintiffs are advised that defendant may present evidence and argue that plaintiffs', S.H.'s, and/or C.M.'s testimony on the lack of a trigger pull is not credible and that a trigger pull was the cause of the shooting.

Dkt. # 48, at 21.  Defendant asserts that Powell's opinion that an inherent defect in the Model 700 rifle caused plaintiffs' injuries does not "fit" the facts of the case.  The Tenth Circuit has explained that expert testimony can be inadmissible if is not "sufficiently 'relevant to the task at hand'" or, stated another way, that it lacks a "fit" to the case.  Bitler, 400 F.3d at 1234.  However, an expert is not required to conclusively rule out each and every cause of an accident if he can "eliminate other possible [causes] as highly improbable . . . and demonstrate that the cause identified is highly probable."  Id. at 1238.

Remington is correct that there is evidence tending to support explanations for the incident other than Powell's theory that a connector defect in the Model 700 caused plaintiffs' injuries.  It is not clear solely from Powell's expert report that he considered these alternate explanations and his report is focused solely on the existence of a defect caused by use of a connector in the Walker fire control system.  Dkt. #  37, at 32-39.  Results-oriented methodology is not consistent with general principles of scientific research, and an expert's testimony may be excluded if an expert reaches a conclusion before conducting an research or examination and simply states facts to support his pre-determined opinion.  Mitchell, 165 F.3d at 783.  The Court has reviewed Powell's expert report and deposition testimony and finds that he adequately considered other alternatives before reaching his causation opinion.  Powell's deposition testimony shows that he gave little weight to the possibility that S.H. or C.M. actually pulled the trigger before the rifle discharged, but due to the conflicting testimony concerning the incident the Court does not find that this is a basis to exclude Powell's testimony. Dkt. # 49-14, at 3.  This issue goes to the weight of Powell's testimony and defendant may cross-examine Powell on this point, but there is evidence in the record showing that S.H. and C.M. deny pulling the trigger.  As to defendant's second argument (debris lodged in

engagement screw), Powell testified in his deposition that such debris would tend to displace the connector and contribute to the product defect he believes existed, and Powell had seen no research to suggest that debris lodged in the engagement screw could independently cause a Model 700 rifle to fire without a trigger pull. Id. at 5-6. As to defendant's third and fourth objections to Powell's methodology, Powell offered an explanation during his deposition as to why it would be difficult to determine if debris between the trigger body and side plate or debris between trigger pin and trigger pivot hole caused the rifle to discharge. Powell stated that debris large enough to cause a trigger pull would likely fall out after the rifle discharged and it would not be detected during subsequent examination of the rifle. Dkt. # 37-2, at 40. This is a plausible explanation for why these causes could be ruled out or, at least, that it would difficult to determine that debris between the trigger body and side plate or debris between trigger pin and trigger pivot hole caused the rifle to fire without a trigger pull.

Although defendant has shown that Powell's conclusions are susceptible to challenge, the Court does not find that his methodology was inherently unreliable or that his process was so results-oriented that he failed to consider other possible explanations for the shooting. However, this does not mean that Powell may testify without limitation. At best, the evidence shows that a connector defect is one possible cause of the shooting, and Powell may not testify in a conclusive manner that this was the actual cause of plaintiffs' injuries. Instead, he may testify that based on his expertise and examination of the subject rifle that the connector defect is a probable cause of the accident. Powell may also not testify about the possibility that partially pulling the trigger reduces the engagement length, because there is no evidence that S.H. or C.M. partially pulled the trigger before

the shooting.[2]  The Court finds that defendant's motion to exclude Powell's testimony should be denied.  The parties are advised that this is a preliminary ruling as to the admissibility of Powell's testimony, and defendant is not precluded from objecting to the admissibility of Powell's testimony at trial.

Even if Powell's testimony is not excluded, defendant argues that, as a matter of Oklahoma law, a manufacturer's products liability case cannot be submitted to a jury if the evidence fails to rule out a cause for an accident for which the defendant would not be liable to plaintiff, and it cites Downs v. Longfellow Corp., 351 P.2d 999 (1960), to support this proposition.  The Court finds that Downs is inapplicable to present case.  Downs was decided well before the Oklahoma Supreme Court first recognized a claim of manufacturer's products liability in Kirkland v. General Motors Corp., 521 P.2d 1353 (Okla. 1974), and Downs did not involve a manufacturer's products liability claim.  In a products liability case, the plaintiff may use circumstantial evidence to prove that there is a substantial probability that an alleged defect caused the plaintiff's injury, but the plaintiff is not required to affirmatively rule out all other possible causes of an accident.  Dutsch v. Sea Ray Boats, Inc., 845 P.2d 187, 191 (Okla. 1992).  At this stage of the case, the parties have cited conflicting evidence as to the cause of the accident, including the opinions of two experts who disagree on the issue of causation, and defendant's motion for summary judgment should be denied.

## III.

Plaintiffs argue that defendant should be precluded from relitigating the issue of whether the Model 700 rifle is defective, because numerous juries and courts have resolved this issue against

---

[2]     This is not an exhaustive list of the possible limitations on Powell's testimony, and defendant is free to raise any other objections it may have during Powell's testimony at trial.

Remington.  Dkt. # 41, at 6-7.  Remington responds that offensive collateral estoppel should not be applied under these circumstances, because Remington has received many judgments in its favor and the existence of inconsistent verdicts weighs heavily against the application of offensive collateral estoppel.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317.  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

"When an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." Dodge v. Cotter Corp., 203 F.3d 1190, 1198 (10th Cir. 2000). The doctrine of collateral estoppel was historically limited to situations in which both parties in a subsequent action were bound by a judgment in a prior case. Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 321 (1971). In Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322 (1979), the Supreme Court authorized the use of nonmutual offensive collateral estoppel in some cases, but offensive collateral estoppel should not be applied when the plaintiff could have easily joined in the earlier action or it would be unfair to the defendant. Id. at 331. Offensive collateral estoppel should not be used to prevent litigation of an issue if the judgment relied upon as the basis for estoppel is inconsistent with other verdicts in favor of the defendant. Id. at 330. "Under *Parklane*, if the components of collateral estoppel are satisfied, its benefits of economizing judicial resources and lessening the burdens of relitigating identical issues already decided, would be afforded a non-mutual plaintiff provided defendant had previously had a full and fair opportunity to litigate the issue." Dodge, 203 F.3d at 1198. In the Tenth Circuit, a district court must consider four factors to determine if collateral estoppel should be applied:

> (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

13

Id.  "[T]he decision to apply offensive collateral estoppel lies within the court's 'broad discretion'"

and it is "not available as a matter of right."  Wallace B. Roderick Revocable Living Trust v. XTO

Energy, Inc., 725 F.3d 1213, 1221 (10th Cir. 2013).

 Plaintiffs have identified three prior cases in which they claim the Model 700 rifle was found

to be defective: (1) Lewy v. Remington Arms Co., Inc., 83-3172-CV-S-2 (W.D. Mo.); (2) Campbell

v. Remington Arms Co., Inc., Case No. A86-037-CIV (D. Alaska); (3) Collins v. Remington Arms

Co., Inc., Case No. 91-11-10856-CV (Maverick County, Texas).  The Court will review each of

these cases to determine if they could form the basis for application of offensive collateral estoppel.

 In Lewy, the plaintiff claimed that he was injured after a Remington Model 700 rifle fired without

a trigger pull and he sued Remington under theories of manufacturer's products liability and

negligent failure to warn.  Lewy v. Remington Arms Co., Inc., 836 F.2d 1104 (8th Cir. 1988).

Plaintiff prevailed on all theories and he was awarded a total of $420,000 in compensatory and

punitive damages.  Id. at 1106.  The Eighth Circuit Court of Appeals found that the trial court erred

in admitting and excluding certain evidence, and it reversed the judgment against Remington and

remanded the case for a new trial.[3]  Id. at 1113.  Plaintiff has produced no evidence showing if the

case was retried on remand or the outcome of any retrial.  The Court finds that Lewy does not

provide any basis to apply collateral estoppel, because there is no evidence that the case was retried

following the appeal and there is no evidence of a binding judgment against Remington.  The second

case plaintiffs rely on is Campbell.  Plaintiffs state that "the same issues were litigated and a final

---

[3] Plaintiffs states that Eighth Circuit made a specific finding that the "M700 was dangerously
defective."  Dkt. # 41, at 16.  The Eighth Circuit made no such finding.  Instead, the Eighth
Circuit stated that there was sufficient evidence from which a reasonable jury "could" have
found that Remington knew of a dangerous condition in the context of punitive damages, but
it made no finding that the evidence was sufficient as to the existence of a product defect.

14

judgment was reached." Dkt. # 41, at 17.  Beyond this general statement, plaintiffs provide no analysis of the facts giving rise to Campbell or the applicable state law.  Even though plaintiffs have undertaken no analysis of these issues, defendant has cited an unpublished Ninth Circuit Court of Appeals decision affirming a jury verdict against Remington.  Campbell v. Remington Arms Co., 1992 WL 54928 (9th Cir. Mar. 24, 1992).  While Campbell did concern allegations that the Model 700 rifle was defective, the rifle at issue was a "customized" Model 700 and it is not clear that it is the same rifle that allegedly caused plaintiffs' injuries.  The Court also notes that plaintiffs have provided no comparison of Alaska and Oklahoma manufacturer's products liability law, and the Court will not undertake such an analysis for plaintiffs.  Campbell cannot be used to apply offensive collateral estoppel in this case.  Finally, plaintiffs argue that Collins supports the use of offensive collateral estoppel against defendant.  In Collins, the plaintiff alleged that his Model 700 rifle "unexpectedly and without cause discharged" and he alleged a manufacturer's products liability claim under Texas law.  Dkt. # 41-16, at 4.  A jury awarded the plaintiff over $2,000,000 in compensatory damages and $15,000,000 in punitive damages.  Texas and Oklahoma both follow Restatement (Second) of Torts § 402A on the issue of the existence of a product defect.  See Swift v. Service Chemical, Inc., 310 P.3d 1127, 1131 (Okla. Civ. App. 2013); Sharyland Water Supply Corp. v. City of Alton, 354 S.W.3d 407, 416 n.9 (Tex. 2011).  However, plaintiffs have not produced any evidence as to what the alleged defect was in Collins, and the Court would be required to speculate that Collins actually involved the same issues as this case.  The party seeking to enforce collateral estoppel has the burden to set forth facts establishing each element.  Nwosun v. General Mills Restaurants, Inc., 124 F.3d 1255, 1258 (10th Cir. 1997).  Plaintiffs have failed to establish that

15

the same product defect was at issue in <u>Collins</u>, and the Court does not find that <u>Lewy</u>, <u>Campbell</u>, or <u>Collins</u> support the use of offensive collateral estoppel against Remington.

Even if the Court had found that <u>Lewy</u>, <u>Campbell</u>, or <u>Collins</u> could be used to enforce offensive collateral estoppel, Remington has identified many other cases in which it prevailed against claims that the Model 700 rifle was defective, and it would not be just or fair to apply offensive collateral estoppel in this case.  Dkt. # 52, at 4-5.  Plaintiffs argue that certain of the cases cited by Remington are distinguishable, because the cases do not involve the same alleged defect at issue in this case.  Plaintiffs' argument highlights the difficulty in applying offensive collateral estoppel in manufacturer's products liability cases.  Plaintiff may be correct that certain cases cited by defendant are distinguishable because of slightly differently allegations concerning the nature of the product defect or the facts giving rise to the injury, but the cases relied upon by plaintiff for application of offensive collateral estoppel suffer from the same problem.  Rather that review in detail each case cited by defendant, the Court finds that it is sufficient that defendant has produced evidence of inconsistent verdicts in products liability cases concerning the same rifle.  <u>Parklane Hosiery</u>, 439 U.S. at 330; <u>Setter v. A.H. Robins Company, Inc.</u>, 748 F.2d 1328 (8th Cir. 1984); <u>Hardy v. Johns-Manville Sales Corp.</u>, 681 F.2d 334 (5th Cir. 1982).  It would not be fair to Remington to pick from a sampling of prior cases concerning the Model 700 rifle and preclude Remington from litigating the product defect issue in this case, and plaintiffs will suffer no prejudice if offensive collateral estoppel is not applied.  The Court finds that the existence of inconsistent verdicts weighs heavily against the application of offensive collateral estoppel and, even if plaintiffs

had met their burden to show that it was appropriate, the Court would exercise its discretion to deny plaintiffs' request to use offensive collateral estoppel in this case.[4]

**IT IS THEREFORE ORDERED** that Remington's Motion to Exclude the Testimony and Causation Opinion of Plaintiffs' Liability Expert, Motion for Summary Judgment, and Opening Brief in Support (Dkt. ## 37, 42, 48) is **granted in part** and **denied in part**: defendant's request to exclude Powell's testimony in its entirety is denied, but the Court finds that Powell's testimony is subject to certain limitations stated in this Opinion and Order.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Partial Summary Judgment (Dkt. ## 40, 46) is **denied**.

**DATED** this 28th day of March, 2014.

_Claire V. Eagan_
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

---

[4]     Plaintiffs raise a separate argument that they should be considered "fault-free" or blameless bystanders, and they argue that Remington should be prohibited from making any argument at trial that plaintiffs bear any comparative fault.  Dkt. # 41, at 22.  The Oklahoma Constitution requires that "the defense of contributory negligence or of assumption of the risk shall in all cases whatsoever, be a question of fact, and shall, at all times, be left to the jury."  OKLA. CONST. art. XXIII, § 6.  In this case, a reasonable jury could find that plaintiffs were not blameless or fault free, even if their hands were not on the rifle, because they were with friends who were climbing through a barbed-wire fence with a loaded rifle and this behavior clearly presented a risk of injury to all persons present.  The cases cited by plaintiffs concern the post-judgment collection of a judgment, not the exclusion of an affirmative defense at trial, and plaintiffs' request for a pretrial ruling that they are blameless or "fault-free" is denied.  The Court will consider the evidence presented at trial to determine if the issue of comparative fault should be submitted to the jury.